**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SLEP-TONE ENTERTAINMENT
CORPORATION,

      Plaintiff,

v.                                Case No.:

BUNGALOW ANGIE'S CORP., an Illinois
Corporation, and BUENGER FORD
ENTERPRISES INC., an Illinois Corporation,

      Defendants.

## COMPLAINT

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its undersigned

counsel, hereby alleges as follows:

## SUMMARY

1.      This is an action by Slep-Tone for vicarious trademark infringement and federal

and state unfair competition in which Defendants are accused of knowingly benefiting from the

use of pirated, counterfeit karaoke accompaniment tracks belonging to Slep-Tone.

2.      Defendants' liability arises from their hiring of a common karaoke operator who

makes use of pirated, counterfeit karaoke accompaniment tracks to produce karaoke shows at

Defendants' venues, and from continuing to hire and utilize the services of that karaoke operator,

having previously been informed of the infringing nature of the operator's services.

3.      Defendants derive a significant financial benefit from the use of this pirated

material in the establishments they control.

**JURISDICTION AND VENUE**

4.        This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125.  This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

5.        This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to Slep-Tone's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

6.        This Court has supplemental jurisdiction over the subject matter of Slep-Tone's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to Slep-Tone's federal claims that they form part of the same case or controversy.

7.        Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of Illinois and the United States District Court for the Northern District of Illinois.

8.        This Court has personal jurisdiction over each Defendant, in that each of them has a principal place of business in this State and federal judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

**THE PLAINTIFF**

9.        Plaintiff Slep-Tone is a North Carolina corporation having its principal place of business in Pineville, North Carolina.

**THE DEFENDANTS**

10.     Defendant Bungalow Angie's Corp. ("Bungalow") is an Illinois corporation that operates an eating and drinking establishment called Bungalow Joe's in Hanover Park, Illinois. Bungalow operates a commercial establishment to which karaoke entertainment is provided by Laura Drzewiecki ("Drzewiecki")[1] as entertainment for Bungalow's patrons, as an inducement for their patronage and purchase of food, drink, and other concessions.

11.     Defendant Buenger Ford Enterprises Inc. ("Buenger Ford") is an Illinois corporation that operates an eating and drinking establishment called Sponge Reef in Schaumburg, Illinois.  Buenger Ford operates a commercial establishment to which karaoke entertainment is provided by Drzewiecki as entertainment for Buenger Ford's patrons, as an inducement for their patronage and purchase of food, drink, and other concessions.

**BACKGROUND FACTS**

12.     Slep-Tone is the manufacturer and distributor of karaoke accompaniment tracks sold under the trademark SOUND CHOICE.

13.     Slep-Tone is recognized as a leading producer of high-quality karaoke accompaniment tracks and has invested more than $18 million to re-record and replicate the authentic sound of approximately 18,000 popular songs across different eras and genres of music.

---

[1] Slep-Tone sued Drzewiecki, among others, in the Northern District of Illinois, Case No. 14-CV-189, Dkt. 1, on January 10, 2014.  Drzeiwecki did not file an answer or a responsive pleading.  The Court entered a default against Drzewiecki on March 19, 2014.  Case No. 14-CV-189, Dkt. 33.  The Court granted Slep-Tone's motion for default judgment on April 23, 2014, awarding damages in the amount of $30,000 in favor of Slep-Tone and against Drzewiecki.  Dkt. 47; Dkt. 48.  The Court further entered a permanent injunction against the display of the Sound Choice Marks by Drzewiecki during her provision of karaoke services unless she is compliant with policies outlined on page 10 of plaintiff's motion for default judgment.  Dkt. 48.

14.     Slep-Tone's dedication to producing music of the highest quality and the most authentic character led to its SOUND CHOICE label being the most recognizable and sought-after in the industry.

15.     Throughout its history, Slep-Tone has released its products for commercial use exclusively on physical media—initially, cassette tapes, and then compact discs beginning in approximately 1994.

16.     Originally, Slep-Tone's compact discs contained karaoke tracks encoded in a special format known as "CD+G," or "compact disc [audio] plus graphics," that allows for synchronized playback of audio and video suitable for prompting singers with lyrics cues.

17.     CD+G discs required special players that were capable of decoding the CD+G format.

18.     More recently, computer technology that allows the karaoke tracks stored on compact discs in CD+G format to be decoded and "ripped" (copied) to a computer hard drive has become widely available.

19.     Copies of karaoke tracks stored on media other than the original compact discs are referred to as "media-shifted copies" because they have been duplicated from the original media and written to non-original media.

20.     Media-shifting also frequently involves format-shifting, the conversion from the original format (such as CD+G) to another format (such as MP3+G or WAV+G).

21.     As the price of computer hard drives of ever-larger size has fallen, professional users now have the technical ability to store a large number of karaoke accompaniment tracks on hard drives for convenient transport to their karaoke shows, without also carrying large numbers of compact discs.

22.     As a result, most professional karaoke operators have shifted to the use of ripped karaoke tracks stored on computer media such as hard drives as a matter of convenience.

23.     However, the same technology is capable of being used not only for convenience but also to allow—on a technical level—the operator to use more music than he or she has paid for and, in some cases, to avoid paying for music at all.

24.     Karaoke operators, like Drzewiecki, have used the available technology to copy one purchased disc to two or more computer systems for simultaneous use; to copy their patrons' discs to the operator's computer hard drive at a show; to "swap" song files with other operators; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with copies of karaoke tracks; and to sell off their original media in the secondary market once they have ripped those media to a hard drive.

25.     The foregoing activities nearly drove Slep-Tone out of business because it became relatively easy to obtain free, or at a nominal cost, illicit copies of products that would cost tens of thousands of dollars if purchased at retail.

26.     Historically, Slep-Tone opposed the shifting of SOUND CHOICE karaoke tracks to alternative media, warning purchasers of CD+G discs that unauthorized copying was a violation of applicable laws.

27.     Beginning in 2009, Slep-Tone established a media-shifting policy ("MSP") that imposes mandatory rules for karaoke operators who use media-shifted copies of SOUND CHOICE karaoke tracks to provide commercial karaoke services.

28.     Briefly stated, the MSP requires compliance with four conditions:  (a) 1:1 ("one-to-one") correspondence, meaning that for every media-shifted SOUND CHOICE karaoke track on a given medium such as a computer hard drive, the operator owns and maintains possession

of a lawful original SOUND CHOICE karaoke track on its original medium, on a one-copy-for-

one-original basis; (b) that the original media that form the basis for 1:1 correspondence are

placed "on the shelf," i.e., not used for any purpose at all; (c) that the operator notify Slep-Tone

that he or she has media-shifted karaoke tracks; and (d) that the operator submit to and be

certified as having passed an audit of the operator's systems to verify complete compliance with

the MSP.

29.     The basis of Slep-Tone's authority to require compliance with the MSP is its right

to control the commercial use of its federally registered trademarks and, as to some tracks, its

ownership of copyright in the synchronized audiovisual words represented by and in the sound

recordings associated with those tracks.

30.     If an operator complies with all four conditions of the MSP, then that operator is

granted permission from Slep-Tone, co-extensive only with Slep-Tone's rights in the subject

matter, to use the media-shifted copies to provide commercial karaoke services.

31.     If an operator fails to comply with any of the conditions of the MSP, then none of

the media-shifting the operator has conducted is permitted, authorized, or tolerated by Slep-

Tone.

## **THE RIGHTS OF THE PLAINTIFF**

32.     Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 1,923,448,

issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-

recorded magnetic audio cassette tapes and compact discs containing musical compositions and

compact discs containing video related to musical compositions."

33.     Plaintiff Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

34.     Plaintiff Slep-Tone is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

35.     Plaintiff Slep-Tone is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows."

36.     Slep-Tone has, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendants, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

37.     Principally, the Sound Choice Marks are indicators of Slep-Tone as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by Slep-Tone or at its direction and under its control.

38.     Slep-Tone is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the

lyrics; (b) the Sound Choice Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

39.     Slep-Tone has used its trade dress continuously and substantially exclusively for a period of decades.

40.     The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of Slep-Tone as a source, effectively functioning as a visual trademark.

41.     The aforementioned trade dress serves to distinguish Slep-Tone's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by these Defendants are capable of identifying a particular karaoke track as originating with Slep-Tone simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

42.     The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

43.     No competitor of Slep-Tone is required to use any element of the Trade Dress to accomplish the cueing function, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the cueing function.

## ACTIVITIES OF DRZEWIECKI

44.     Drzewiecki provides karaoke services to various venues in Illinois, principally concentrated in the Chicago metropolitan area, including the above identified venues operated by Bungalow, and Buenger Ford.

45.     On information and belief, in order to provide services, rather than using original karaoke discs that she possesses (if she indeed possesses such discs), Drzewiecki relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

46.     On information and belief, Drzewiecki relies upon at least one such computer hard drive described in paragraph 45 herein.

47.     On information and belief, Drzewiecki created, or directed another to create, or otherwise acquired from a third party the files that are stored on her computer hard drive(s).

48.     On information and belief, Drzewiecki does not maintain a 1:1 correspondence relationship between her hard drives and original discs she might have lawfully acquired.

49.     Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on Drzewiecki's computer hard drives at the time those files were so stored.

50.     On information and belief, many of the files stored on the Drzewiecki's computer hard drives are representative of karaoke tracks originally created by Slep-Tone and are marked with the Sound Choice Marks.

51.     When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

52.     Slep-Tone did not authorize Drzewiecki to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

53.     As such, the placement of the Sound Choice Marks and the Trade Dress upon the Drzewiecki's self-created computer files is a false designation of the origin of those computer files.

54.　At all times relevant to the causes of action stated herein, Drzewiecki has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

55.　Drzewiecki's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

56.　A patron or unwitting customer of Drzewiecki, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of Drzewiecki's shows, is likely to be confused into believing, falsely, that Slep-Tone created the tracks in use or authorized their creation.

57.　Drzewiecki's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because she is paid to provide access to and play those computer files and tracks at karaoke shows.

58.　Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Drzewiecki is compensated and which inure to her benefit.

59.　On information and belief, Drzewiecki's piracy of accompaniment tracks is not limited to Slep-Tone's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

60.　On information and belief, Drzewiecki facilitated karaoke shows at multiple venues in this State.

61.　On information and belief, the Sound Choice Marks were displayed on video monitors during various songs played by Drzewiecki.

62.     Slep-Tone obtained photographs and videos of displays of the Sound Choice Marks.

63.     On information and belief, Drzewiecki has not complied with Slep-Tone's MSP, and therefore her use of the Sound Choice Marks were not authorized proper use.

## ACTIVITIES OF DEFENDANTS

### Defendant Bungalow

64.     Bungalow hired Drzewiecki to provide commercial karaoke services at its establishment Bungalow Joe's.

65.     Bungalow has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

66.     Slep-Tone or its representatives informed Bungalow of the infringing and counterfeit character of Drzewiecki's karaoke accompaniment tracks.

67.     Slep-Tone offered Bungalow the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable Slep-Tone to assess whether those contractors are operating legally.

68.     Slep-Tone also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

69.     As a result of Slep-Tone's efforts, Bungalow has actual knowledge of the infringing and counterfeit nature of Drzewiecki's karaoke materials.

70.     Despite that knowledge, Bungalow failed and refused to terminate Drzewiecki's services.

71.     Despite that knowledge, Bungalow continued to receive a financial benefit from the provision of infringing karaoke services at its establishment Bungalow Joe's by Drzewiecki, through the attraction of paying patrons to their establishments.

72.     As such, Bungalow operated in actual or apparent partnership with Drzewiecki, in a symbiotic relationship from which both benefit.

73.     Bungalow is liable for the acts of trademark infringement directly engaged in by Drzewiecki on their respective premises or for their benefit.

**Defendant Buenger Ford**

74.     Buenger Ford hired Drzewiecki to provide commercial karaoke services at its establishment Sponge Reef.

75.     Buenger Ford has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

76.     Slep-Tone or its representatives informed Buenger Ford of the infringing and counterfeit character of Drzewiecki's karaoke accompaniment tracks.

77.     Slep-Tone offered Buenger Ford the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable Slep-Tone to assess whether those contractors are operating legally.

78.     Slep-Tone also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

79.     As a result of Slep-Tone's efforts, Buenger Ford has actual knowledge of the infringing and counterfeit nature of Drzewiecki's karaoke materials.

80.     Despite that knowledge, Buenger Ford failed and refused to terminate Drzewiecki's services.

81.     Despite that knowledge, Buenger Ford continued to receive a financial benefit from the provision of infringing karaoke services at its establishment Sponge Reef by Drzewiecki, through the attraction of paying patrons to their establishments.

82.     As such, Buenger Ford operated in actual or apparent partnership with Drzewiecki, in a symbiotic relationship from which both benefit.

83.     Buenger Ford is liable for the acts of trademark infringement directly engaged in by Drzewiecki on their respective premises or for their benefit.

## **DAMAGES**

84.     Drzewiecki's unauthorized use of Slep-Tone's trademarks has damaged Slep-Tone.

85.     Drzewiecki has also enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

86.     Drzewiecki's illicit activities have also allowed her to compete unfairly against Slep-Tone's legitimate customers by lowering its cost of doing business through piracy of the music materials it uses.

87.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Drzewiecki operates by helping to crowd higher-cost but legitimate operators out of the market.

88.     Drzewiecki's acts deprived Slep-Tone of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

89.     The Defendants' unauthorized use of and benefit from the use of the Sound Choice Marks have damaged Slep-Tone both in the aggregate and individually.

90.     The Defendants have damaged Slep-Tone in an amount of at least $100,000.

91.     Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to Slep-Tone and to other manufacturers, the Defendants have cost Slep-Tone in excess of $100,000 in revenue from legitimate sources crowded out of the market by the Venue Defendants' piracy.

## FIRST CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT
### AGAINST DEFENDANT BUNGALOW

92.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-91 of this Complaint.

93.     Bungalow knowingly directly benefited from the use of, and through Drzewiecki used, a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of karaoke entertainment services, by displaying and permitting to be displayed the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

94.     Bungalow's use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

95.     Slep-Tone did not license Bungalow to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the services provided at its establishments Bungalow Joe's.

96. Use of the Sound Choice Marks in the manner attributable to Bungalow is likely to cause confusion, or to cause mistake, or to deceive Bungalow's customers into believing that the services those customers are receiving are being provided with the authorization of the Slep-Tone using bona fide, legitimate, authorized karaoke accompaniment tracks.

97. Bungalow's acts were willful and knowing.

98. Slep-Tone has been damaged by infringing activities of Bungalow.

99. Unless enjoined by the Court, Bungalow's infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

## SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### AGAINST DEFENDANT BUNGALOW

100. Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-91 of this Complaint.

101. On each occasion when Bungalow permitted a Slep-Tone accompaniment track to be played during a karaoke show, Bungalow permitted the display of the Sound Choice Marks in connection with Drzewiecki's karaoke entertainment services.

102. The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved Bungalow's services and commercial activities.

103. The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased by Drzewiecki's for use in providing karaoke entertainment services.

104.    Bungalow's use of the Sound Choice Marks in this fashion would have inured to the benefit of Slep-Tone if Drzewiecki had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

105.    Because Slep-Tone has been denied this revenue, it has been damaged by the Bungalow's uses.

106.    On each occasion when Bungalow permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Bungalow permitted the display of the words, names, and symbols of the other manufacturer in connection with Drzewiecki's karaoke services.

107.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Drzewiecki acquired in a legitimate manner.

108.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold those manufacturers and purchased by Drzewiecki.

109.    Bungalow's use of the false designations of origin in this fashion damages Slep-Tone by enabling Bungalow, through Drzewiecki, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including the Slep-Tone's legitimate customers.

110.    The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

111.    Because Slep-Tone has been denied this revenue, it has been damaged by Bungalow's false designations of origin relating to other manufacturers.

112.    Unless enjoined by the Court, Bungalow's unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

**THIRD CLAIM FOR RELIEF**
**ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**AGAINST DEFENDANT BUNGALOW**

113.    Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-91 of this Complaint.

114.    Bungalow hired Drzewiecki to provide commercial karaoke services at its establishment, and it had the right and ability to control Drzewiecki's use of authorized or counterfeit materials for said commercial purposes.

115.    Bungalow permitted Drzewiecki to engage in acts of infringement of the Sound Choice Marks and the Trade Dress, in derogation of Slep-Tone's common law and statutory rights in those marks.

116.    Drzewiecki's acts of infringement occurred during the conduct of trade or commerce, from which Bungalow derived an economic benefit.

117.    Bungalow enabled Drzewiecki's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

118.     Bungalow enabled Drzewiecki's' acts of infringement causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by Slep-Tone.

119.     As a direct and proximate result of each of Drzewiecki's acts of infringement and Bungalow's encouragement thereof, Slep-Tone has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Drzewiecki's acts in creating or acquiring counterfeits of Slep-Tone's accompaniment tracks.

120.     As such, Slep-Tone has been damaged and is likely to be further damaged by a deceptive trade practice of Drzewiecki, aided by Bungalow's encouragement, within the meaning of 815 ILCS § 510/3.

121.     Unless enjoined by the Court, Drzewiecki's unfair competition activities, aided by Bungalow's encouragement, as described above will continue unabated and will continue to cause harm to Slep-Tone.

**FOURTH CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**AGAINST DEFENDANT BUENGER FORD**

122.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-91 of this Complaint.

123.     Buenger Ford knowingly directly benefited from the use of, and through Drzewiecki used, a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of karaoke entertainment services, by displaying and permitting to be

displayed the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

124.     Buenger Ford's use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

125.     Slep-Tone did not license Buenger Ford to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks in connection with the services provided at its establishments Sponge Reef.

126.     Use of the Sound Choice Marks in the manner attributable to Buenger Ford is likely to cause confusion, or to cause mistake, or to deceive Buenger Ford's customers into believing that the services those customers are receiving are being provided with the authorization of the Slep-Tone using bona fide, legitimate, authorized karaoke accompaniment tracks.

127.     Buenger Ford's acts were willful and knowing.

128.     Slep-Tone has been damaged by infringing activities of Buenger Ford.

129.     Unless enjoined by the Court, Buenger Ford's infringing activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

### FIFTH CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### AGAINST DEFENDANT BUENGER FORD

130.     Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-91 of this Complaint.

131.     On each occasion when Buenger Ford permitted a Slep-Tone accompaniment track to be played during a karaoke show, Buenger Ford permitted the display of the Sound Choice Marks in connection with Drzewiecki's karaoke entertainment services.

132.    The display of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that Slep-Tone sponsored or approved Buenger Ford's services and commercial activities.

133.    The display of the Sound Choice Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by Slep-Tone and purchased by Drzewiecki's for use in providing karaoke entertainment services.

134.    Buenger Ford's use of the Sound Choice Marks in this fashion would have inured to the benefit of Slep-Tone if Drzewiecki had legitimately acquired genuine Sound Choice discs instead of counterfeiting them or acquiring counterfeit copies, in that Slep-Tone would have received revenue from such sales.

135.    Because Slep-Tone has been denied this revenue, it has been damaged by the Buenger Ford's uses.

136.    On each occasion when Buenger Ford permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Buenger Ford permitted the display of the words, names, and symbols of the other manufacturer in connection with Drzewiecki's karaoke services.

137.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Drzewiecki acquired in a legitimate manner.

138.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold those manufacturers and purchased by Drzewiecki.

139.    Buenger Ford's use of the false designations of origin in this fashion damages Slep-Tone by enabling Buenger Ford, through Drzewiecki, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including the Slep-Tone's legitimate customers.

140.    The consequential denial of revenue from a legitimate market for Slep-Tone's customers' services prevents Slep-Tone's customers from making purchases of material from Slep-Tone and is thus a denial of revenue to Slep-Tone.

141.    Because Slep-Tone has been denied this revenue, it has been damaged by Buenger Ford's false designations of origin relating to other manufacturers.

142.    Unless enjoined by the Court, Buenger Ford's unfair competition activities as described above will continue unabated and will continue to cause harm to Slep-Tone.

### SIXTH CLAIM FOR RELIEF
### ILLINOIS DECEPTIVE TRADE PRACTICES ACT
### AGAINST DEFENDANT BUENGER FORD

143.    Slep-Tone repeats and incorporates by reference herein its allegations contained in Paragraphs 1-91 of this Complaint.

144.    Buenger Ford hired Drzewiecki to provide commercial karaoke services at its establishment, and it had the right and ability to control Drzewiecki's use of authorized or counterfeit materials for said commercial purposes.

145.     Buenger Ford permitted Drzewiecki to engage in acts of infringement of the Sound Choice Marks and the Trade Dress, in derogation of Slep-Tone's common law and statutory rights in those marks.

146.     Drzewiecki's acts of infringement occurred during the conduct of trade or commerce, from which Buenger Ford derived an economic benefit.

147.     Buenger Ford enabled Drzewiecki's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

148.     Buenger Ford enabled Drzewiecki's acts of infringement causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by Slep-Tone.

149.     As a direct and proximate result of each of Drzewiecki's acts of infringement and Buenger Ford's encouragement thereof, Slep-Tone has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Drzewiecki's acts in creating or acquiring counterfeits of Slep-Tone's accompaniment tracks.

150.     As such, Slep-Tone has been damaged and is likely to be further damaged by a deceptive trade practice of Drzewiecki, aided by Buenger Ford's encouragement, within the meaning of 815 ILCS § 510/3.

151.     Unless enjoined by the Court, Drzewiecki's unfair competition activities, aided by Buenger Ford's encouragement, as described above will continue unabated and will continue to cause harm to Slep-Tone.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Slep-Tone prays for judgment against Bungalow and Buenger Ford that the Court:

A.  Find that Bungalow and Buenger Ford committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.  Find that Bungalow and Buenger Ford engaged in unfair competition detrimental to Slep-Tone in violation of 15 U.S.C. § 1125(a);

C.  Enter judgment against Bungalow and Buenger Ford and in favor of Slep-Tone on all applicable counts;

D.  Find the activities of Bungalow and Buenger Ford were in all respects conducted willfully and for profit;

E.  Award to Slep-Tone the profits of Bungalow and Buenger Ford and the damages sustained by Slep-Tone because of the conduct of Bungalow and Buenger Ford in infringing the Sound Choice Marks, the Sound Choice Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

F.  Award to Slep-Tone the profits of Bungalow and Buenger Ford and the damages sustained by Slep-Tone because of Drzewiecki's acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

G.      Award to Slep-Tone treble, punitive, or otherwise enhanced damages, as available, for acts of willful infringement by and in the amount of $100,000 from each of the Defendants;

H.      Grant Slep-Tone preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by Bungalow and Buenger Ford;

I.      Award Slep-Tone its costs suit and attorney fees, to the extent not awarded above; and

J.      Grant Slep-Tone such other and further relief as justice may require.

Respectfully submitted this the 2nd day of May 2014.

Respectfully Submitted,

/s/ Frank Young

An Attorney for Plaintiff

Attorneys for Plaintiff Slep-Tone:

Konrad Sherinian
Frank Young
The Law Offices of Konrad Sherinian, LLC
1755 Park Street, Suite #200
Naperville, IL 60563
Phone: (630) 318-2606
Fax: (630) 318-2605
Email: ksherinian@sherinianlaw.net
Email: fyoung@sherinianlaw.net